Larry WILLIAMS, Petitioner,

v.

Dominic MANTELLO, Superintendent,
Coxsackie Correctional Facility,
Respondent.

No. 98–CV–6333.

United States District Court,
W.D. New York.

March 29, 2005.

Larry Williams, Attica, NY, pro se.

Robert Mastrocola, Monroe County District Attorney's Office, Rochester, NY, for Respondent.

### DECISION AND ORDER

BIANCHINI, United States Magistrate Judge.

### INTRODUCTION

Larry Williams ("Williams") filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Monroe County Court on two counts of second degree murder and three counts of first degree robbery. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(b).

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Williams's conviction arises from the robbery and shooting death of Benny Lee Dukes ("Dukes"). In the early morning hours of November 20, 1994, Dukes was robbed by several men while he was standing on the front porch of a friend's house at 18 Maria Street in the City of Rochester. Dukes's dead body was discovered on November 21, 1994, on the back porch of a house several hundred yards away.

When Williams was arrested on November 22, 1994, he gave a statement to police admitting that he and four others participated in the robbery of Dukes. Three of the four alleged confederates also were named in the indictment: Dedric Chislum ("Chislum"), Anthony Latson ("Latson"), and Gerome McCullough ("McCullough"). The indictment charged Williams, Chislum, Latson and McCullough with two counts of second degree murder (intentional and felony murder), three counts of first degree robbery, and one count of second degree criminal possession of a weapon. Severance was granted and Williams was tried separately from his co-defendants in Monroe County Court. Ultimately, the weapons charge was not submitted to the jury at Williams's trial.

At trial, the jury heard testimony that Dukes's body was found in a nearly sitting position on the steps of an abandoned house on Theodore Street. Dukes's pants were down around his ankles, and he had a large hole in his chest near his heart from a gunshot blast, as well as recent abrasions

on both knees and the lower portion of his right leg. The coroner's evidence established that Dukes had been shot once at close range and had died from that wound. T.573–75, 591, 602, 606.[1]

Angela Timmons ("Timmons"), Chislum's sister and Williams's aunt, was one of the three eyewitnesses to the murder. She testified that she had been smoking crack cocaine for a period of two to three days prior to the incident with Luz Roman and Maria Bermudez at their house at 18 Maria Street. T.351, 368, 371, 392. That night, Timmons witnessed four men confront Dukes on the front porch of 18 Maria Street. She recognized her brother, Chislum, as one of the four men. Chislum had a gun trained on Dukes while the three other individuals struggled with Dukes. T.354, 358, 367–68. With respect to the other assailants, Timmons testified that Williams was her nephew, and that she only knew McCullough and Latson by their street names, "Chunky" and "Gilla", respectively.

Timmons heard Dukes tell them first that he had no money and then that he had $5. Chislum then yelled, "Move, man, move!" His three cohorts stepped away from Dukes. At that moment, the gun went off. Timmons testified that Dukes and Chislum were standing face-to-face, about three to four feet away from each other at that time. T.359. Timmons turned away from the window when the shot was fired; when she looked outside again, she only saw two young men dashing through a short cut to Theodore Street. One of them was "Gilla" (i.e., Latson) but she did not see who the other one was. T.361. Timmons then heard two more shots.

About ten or fifteen minutes later, Williams returned to 18 Maria Street; he had a gun in his hands. Williams, who appeared nervous and upset to Timmons, said, "You didn't see anything, right?" Timmons assured him that they had not seen anything. He left soon thereafter, but did not go in the direction of Theodore Street. T.365, 393–97.

On cross-examination, defense counsel introduced three inconsistent statements by Timmons. First, two days after the robbery, Timmons had informed the police that Chislum was standing *behind*, rather than in front of Dukes. T.381. Second, at the grand jury proceeding, Timmons had said that when the gun went off, Chislum was two to three steps *behind* Dukes. T.384. Third, Timmons had told a private investigator employed by Chislum's defense team that the gun had been pointed up in the air and could not have hit Dukes. T.383. In order to further undermine the key testimony provided by Timmons, defense counsel called a pharmacological expert who testified that the effects of a two to three day cocaine binge could impair a person's ability to perceive and recall events. T.669–70.

Roman, another eyewitness, testified with some difficulty through an interpreter that Chislum came over on the night of November 19 and asked to borrow Dukes's car. Dukes refused and Chislum left. Williams came over and asked Roman if Dukes had any money, and she replied that he did not. According to Roman, Dukes left ten minutes later. Williams followed Dukes and told him to hand over his money; Dukes said that he did not have any money. Roman testified that after Dukes said that he had no money, "[t]he four people killed him." T.476. She testified that Williams had the gun at first but then gave it to Chislum. Roman testified that when the shot was heard,

---

1. Citations to "T.___" refer to the trial tran- script.

Williams had the gun; moments later, she testified that, in fact, it was Chislum who had the gun when the shot was fired. T.477. The four men then ran "towards the other place," which Roman was unable to identify. T.478.

Roman testified that Williams returned to the house several minutes later with the gun and said, "Mommy, me happy." T.479–80. According to Roman, Williams typically called her "Mommy," even though she was not his mother. Roman testified that she was crying; she waited for William to leave and she then went to her brother's house for several days. T.481.

On cross-examination, Roman asserted her Fifth Amendment right against self-incrimination when defense counsel asked her if she used cocaine on the night of Dukes's murder, if she prostituted in order to support herself financially, and if she forced her daughter, Maria Bermudez, to prostitute herself. T.480–84. Roman reiterated that Williams had the gun when it went off; defense counsel confronted her with the transcript of her testimony from a previous trial in the matter of Dukes's murder in which she testified that she saw Chislum shoot the gun. T.488.

Maria Bermudez ("Bermudez"), Roman's daughter and the third eyewitness, testified that late on the night of November 19, she was with her mother and Dukes at the house on Maria Street. Chislum came over to use the bathroom and asked Dukes to "hold his car." Dukes refused and Chislum left. Williams came over to the house and asked Roman if Dukes had any money; when Roman replied negatively, Williams left. When Dukes left the house, Bermudez saw Chislum and three other men coming up the porch steps. Chislum had the gun pointed at Dukes, and the other three rifled through Dukes's pockets looking for money. T.507, 524–25.

Bermudez testified that there was no light on the front porch so she was unable to see the events transpiring there very well. She heard the gun go off, but she did not see the actual shot. T.507, 523. According to Bermudez, Chislum had the gun at the time the shot was heard. T.508. Everyone disappeared and soon thereafter, Bermudez head two more gunshots. Williams came to the back door several minutes later. When Timmons let him in, Bermudez did not see that he had a gun. T.509. Williams then left.

Dhoretha Pass ("Pass"), who lived across the street, testified that she was woken up by a gunshot. She immediately heard the sound of footsteps running toward her backyard followed by two more gunshots. T.611–12. When she looked out her window, she saw two men whom she identified as Chislum and Williams running across the street in front of her house. T.613, 622. Pass observed Chislum carrying a gun. T.613, 624.

The coroner testified that Dukes could have moved vigorously for several minutes after receiving the gunshot wound to his chest. T.582. No blood was found at Maria Street, on the ground on the way to Theodore Street, or on Dukes's clothes apart from the immediate area of the wound. T.535, 555–57, 636, 639. However, the coroner testified, the chest wound would not necessarily have caused a great deal of external bleeding. T.583.

At the close of the proofs, defense counsel requested that the court add to its felony murder instruction the following language: "[I]f the jury finds that the killing is an intentional act by a person other than [defendant] for purposes unrelated to the robbery, then it would not be a felony murder." T.671–72. Counsel maintained that the proof presented supported a finding that Chislum's shooting of Dukes

was an independent act unrelated to the robbery and that it occurred after the robbery was completed, at a different location and when Williams was not present. T.672–73. After hearing argument from the prosecutor, the trial court refused to charge as requested but informed defense counsel that he could argue that point in summation. T.675. With regard to the intentional murder charge, counsel requested that the court "clearly elucidate the fact that [defendant] must have a specific intent to cause the death ... of the deceased." T.674. The court agreed.

On June 23, 1995, the jury returned a verdict convicting Williams of all counts in the indictment. He was sentenced on August 4, 1995, to 25 years to life on the murder convictions and 8⅓ to 25 years on the robbery charges, all sentences to run concurrently to each other.

The Appellate Division, Fourth Department, unanimously affirmed the judgment of conviction on May 30, 1997. *People v. Williams*, 239 A.D.2d 922, 659 N.Y.S.2d 597 (4th Dept.1997). Leave to appeal to the New York Court of Appeals was denied on August 20, 1997. *People v. Williams*, 90 N.Y.2d 912, 663 N.Y.S.2d 524, 686 N.E.2d 236 (N.Y.1997).

This federal habeas petition followed in which Williams raises the following grounds for habeas relief: (1) the felony murder charge was erroneous; (2) the intentional murder charge was erroneous; and (3) the sentence was harsh and excessive. Respondent concedes that Williams has fully exhausted state remedies with respect to all of his habeas claims. *See* 28 U.S.C. § 2254(b).

### DISCUSSION

*Standard of Review*

To prevail under 28 U.S.C. § 2254, as amended in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375–76, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

### *Merits of the Petition*

#### I. Erroneous Jury Instructions

##### A. Standard for Reviewing Jury Instructions

A habeas petitioner has a high hurdle to clear before obtaining relief based on an allegedly infirm jury instruction. In reviewing the propriety of the challenged instruction, the habeas court must ask "whether the ailing instruction by itself so affected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *accord, e.g., Del-Valle v. Armstrong*, 306 F.3d 1197, 1200–01 (2d Cir.2002). The issue is not whether the instruction is "undesirable, erroneous or even 'universally condemned'" but whether the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp*, 414 U.S. at 146–47, 94 S.Ct. 396 (citations omitted); *accord, e.g., Chalmers v. Mitchell*, 73 F.3d 1262, 1267 (2d Cir.1996). The Supreme Court has held that it is a "'well-established proposition that single instruction to the jury may not be judged in artificial isolation,' but rather must be judged as the jury understood it, as part of the whole instruction, and indeed, as part of all the proceedings that were observed by the jury." *Chalmers*, 73 F.3d at 1267

(quoting *Cupp,* 414 U.S. at 146–47, 94 S.Ct. 396); *accord DelValle,* 306 F.3d at 1201.

## B. The Intentional Murder Instruction

At the beginning of its charge to the jury, the trial court defined accessory liability as follows: ·

> To be guilty under § 20.00 of the Penal Law, "the *People must prove that the defendant, Williams, acted with the mental culpability required for the commission of the crime of Murder—Intentional Murder in the 2d Degree* and Robbery in the 1st Degree with three counts. You will recall that in defining—as I will define those crimes, the *People must prove as an essential element of these crimes that the defendant acted intentionally.* Therefore, before defendant Williams can be criminally liable for the conduct of the other defendants, *the People must prove that defendant Williams, in fact, intended that such conduct be performed.*
>
> .      .      .      .      .
>
> Bear in mind it is not sufficient if the People establish merely that defendant Williams associated with the other defendants or that defendant Williams was present at the time the other defendant or defendants committed the conduct alleged to constitute the crime[ ] of Intentional Murder[.] ... *As instructed, the People must prove that the defendant, Williams, himself intentionally or knowingly engaged in conduct alleged to constitute the crime* [sic] *of Intentional Murder and Robbery in the 1st Degree under three theories".*

T.744–46 (emphasis supplied). As to the count charging murder in the second degree (intentional murder), the trial court charged that the People were required to prove beyond a reasonable doubt that, among other things,

> the *defendant, either in accessory or as in principal shot Benny Lee Dukes with the intent to cause the death of Benny Lee Dukes.* According to law, a person intends to cause the death of another person when his conscious aim or objective is to cause the death of that person. It is not necessary for the People to establish that the intent to kill was present in the mind of the *defendant or defendants* for any period of time before Benny Lee Dukes was shot.

T.747 (emphasis supplied).

The jury requested that the felony murder, intentional murder, and robbery charges be re-read, along with the elements of each of the charges. T.757. The trial judge first read back the section of the Penal Law defining accomplice liability, *see* T.763, which was the same as that given previously, *see* T.744–45. When the court read the definition of intentional murder, he slightly changed the phrasing of the instruction by referring to "defendants" in the plural:

> [The prosecution must prove] that the *defendants* shot Benny Lee Dukes with the intent to cause the death of Benny Lee Dukes. According to law, a person intends to cause the death of another person when his conscious aim or objective is to cause the death of that person. It is not necessary for the People to establish that the intent to kill was present in the mind of the *defendants* for any period of time before Benny Lee Dukes was shot. It is sufficient if you find that such intent to kill was in the minds of the *defendants* when, in fact, Benny Lee Dukes was shot.

T.765 (emphasis supplied). *Compare with* T.747, quoted *supra.*

Some time later, the jury asked to be re-read the intentional murder charge. T.773. Defense counsel indicted that after

listening to the Court's intentional murder charge "the second time it was read," *see* T.765, it was "confusing to [him] as to whether or not the explanation indicated that my client specifically had to have the intent to kill Mr. Dukes . . . perhaps[ ] due to the way Section 20.20 [*sic*] and the charge on Intentional Murder were read separately." T.773. Defense counsel elaborated, stating that the charge appeared to indicate that as long as one of the co-defendants had the intent to cause death, then the jury could convict Williams of intentional murder. T.775–76. The trial court, apparently misunderstanding defense counsel's objection, asked if he wanted the first element to read that the jury must find "that the defendant, Larry Williams, shot Benny Lee Dukes[.]" T.776. At that point, prosecutor told the court, "You can't do that." *Id.* Defense counsel added that such a statement was contrary to the facts. *Id.*

The trial court proceeded to have the court reporter re-read the first version of the intentional murder charge (*see* T.747). T.778. Defense counsel excepted to the instruction on the basis that it allowed the jury to convict Williams as long as the co-defendants had the intent to kill Dukes. T.778–79. The trial judge did not deem it necessary to clarify the charge, stating that he thought it "clear that they're [*sic*] talking about [Williams] as an accessory." T.780.

The jury asked a third time to hear the instructions on accomplice liability, robbery committed while displaying what appeared to be a firearm, and intentional murder. T.780. The court reporter read the charges as given during the trial court's first iteration. T.780–81; *see* T.745–47, quoted *supra.* Defense counsel again excepted to the intentional murder charge, noting that in the context of discussing when the intent to cause death

must arise, the court "very specifically indicate[d] that the jury can find that there's no specific time when the intent must be formed[;] [i]t must be in the mind of the defendant or defendants at the time Mr. Dukes died." T.781. According to defense counsel, such phrasing "clearly allows the jury, through the use of the word 'or,' to find that if the defendants . . . had the intent to kill [Dukes] at the time that they did kill him, that [Williams] can be convicted." *Id.* Defense counsel asked for a re-instruction, or, in the alternative, a mistrial, both of which were denied. T.782. The trial judge agreed with the prosecutor's argument that the accomplice liability charge "clearly says that the defendant must also have the intent to commit the crime of murder." *Id.* Read in conjunction with that charge, the prosecutor argued, the intentional murder charge sets forth the level of intent necessary to convict Williams. *Id.*

On direct appeal, the Fourth Department rejected Williams's contention that the instruction "erroneously permitted the jury to convict him of intentional murder without finding that defendant himself intended to kill." *People v. Williams,* 239 A.D.2d at 922, 659 N.Y.S.2d 597. According to the state court, the proper test is "whether, from the court's charge as a whole, the jury would have understood the correct principles." *Id.* In this case, the Fourth Department found, the trial court "repeatedly instructed the jury that, in order to be guilty of intentional murder, defendant must have intended to kill." *Id.*

Williams contends that the use of the disjunctive, "the defendant or such defendants," in the trial court's original intentional murder charge, *see* T.747, erroneously relieved the People of their burden to prove that Williams himself had the specific intent to kill. This particular charge was read back by the court report-

er to the jury in response to its third and fourth requests for re-instruction. Following the jury's second request, the trial judge charged the jury himself and substituted the phrase "the defendants" for the "defendant or such defendants." Williams complains principally about the court's phrasing when it gave the initial charge.

■ Respondent argues that the offending phrase, "defendant or such defendants," was used in the context of the trial court's point that the intent to kill need not have existed for any period of time prior to the shooting but instead only must have been present at the time of the shooting. Respondent's Memorandum of Law ("Resp.Mem.") at 2 (Docket # 8). Respondent asserts that "this 'premeditation instruction' was really a subpart of the general instruction on intent." *Id.* I agree with respondent that this is an accurate reading of the charge and that Williams's argument takes the erroneous disjunctive phrase out of context. In addition, I disagree with Williams that this instruction concerning the timing of the intent was the only instruction on the intent element of intentional murder: at the very beginning of the intentional murder charge, the court informed the jury that the People must prove that "defendant, either in accessory or as in principal[,] shot Benny Lee Dukes with the intent to cause the death." T.747. Granted, the trial judge's wording was not very artful. However, he did convey to the jury the notion that defendant, must have possessed the intent, at least as an accessory, to cause Dukes's death.

Respondent also argues that the trial court properly instructed the jury on accessory liability by stating that the People must prove that Williams acted with the "mental culpability required for the commission of the crime of ... Intentional Murder ... and Robbery[.]" T.744; Resp. Br. at 2–3 (Docket # 8). The trial court

further stated that "the People must prove as an essential element of these crimes that the defendant acted intentionally." "Therefore," the court continued, "before ... Williams can be criminally liable for the conduct of the other defendants, the People must prove that ... Williams, in fact, intended that such conduct be performed." T.745.

■ According to respondent, these statements concerning intent cured any error that may have existed in the court's intentional murder charge. Williams concedes that the trial court's instruction on accessory liability was partially correct. Petitioner's Memorandum ("Pet'r Mem.") at 12 (Docket # 4). He takes issue, however, with the trial court's "generic" accessory liability charge because it never indicated specifically what "such conduct" encompasses. *Id.* However, the jury knew that there were both murder and robbery charges about which it needed to deliberate. A reasonable juror of average intelligence would have understood "such conduct" to refer to the behavior constituting intentional murder and armed robbery, which the trial court subsequently explained. He also objects to the trial court's "lumping together," *id.* at 3, of the intentional murder and robbery counts in the following instruction:

"[T]he People must prove that ... Williams, himself intentionally and knowingly engaged in conduct alleged to constitute the crime [*sic*] of Intentional Murder and Robbery in the 1st Degree under three theories."

T.745–46. Williams argues that under the foregoing charge, the jury could have concluded that Williams "intentionally gave Dedric Chislum the gun (or engaged in conduct [*sic*]), thus satisfying the 'intended that such conduct be performed' element." Had the court said "intentional murder *or* robbery," I would agree that

such a conclusion was possible. However, the trial judge stated that Williams intentionally must have engaged in the conduct alleged to constitute intentional murder *and* robbery. A reasonable juror hearing that instruction would have understood it to mean that Williams must have engaged in behavior amounting to both intentional murder and robbery. I do not find it likely that a reasonable juror would conclude, based upon that language, that merely providing the weapon to the actual shooter was enough to subject Williams to accessory liability for intentional murder. Moreover, prior to this part of the charge, the trial court informed the jury that it was not sufficient for the People to prove that Williams merely associated with the other defendants or simply was present when the other defendants committed the murder and robbery. T.745.

▌ Williams further argues that "nothing in the [Penal Law] § 20.00 charge sets forth that which is required as to the 'intent to cause death' element of intentional murder." Pet'r Mem. at 12 (Docket # 4). However, the accessory liability charge does not explain the substantive elements of *any* of the crimes with which Williams was charged; that typically is not the function of the accessory liability charge. During the intentional murder charge, the trial judge explained that "[a] person is guilty of Murder in the 2nd Degree when, with intent to cause the death of another person, he causes the death of such person." This is a correct statement of the law. As noted above, the trial judge's further description of "intent" in the intentional murder charge was not very lengthy and perhaps could have been clearer. However, it was not plainly incorrect unless one removes the phrase "defendant or defendants" from its context in the court's instruction concerning the time that the necessary intent must have arose.

I can see that there might have been a greater probability of confusion if the timing portion of the charge (in which the offending phrase "defendant or defendants" appeared) was the only time that the trial court instructed the jury as to the intent requirement. In such a case, the jury might have understood the law to allow conviction of intentional murder based on proof that either Williams *or* one of the other defendants possessed the intent to cause death at the time Dukes was shot, which is insufficient to meet the standard of proof required by the Constitution. However, the trial judge informed the jury that it must find that Williams, "either in accessory or as in principal," shot the victim "with the intent to cause death." The court also explained that "a person intends to cause the death of another person when his conscious aim or objective is cause the death of that person." In addition, the court told the jury the context of its accessory liability instruction that it must find that Williams acted intentionally with regard to the elements of *all* of the charged crimes. Looking at the jury charge in its entirety, it instructed that jury that, in order to convict, it had to find that Williams himself possessed the requisite intent to commit all of the crimes charged. *See, e.g., McDonald v. Smith*, 2003 WL 22284131, at *4 (E.D.N.Y. Aug.21, 2003) (although the court's acting in concert charge "ma[de] it sound as though the jury only needs to find intent for either the petitioner or the co-defendant but not both," the court later said that " 'an accessory or aider or abettor must share the intent of the principal actor before he may be liable for the crime. And you, as fact finders, must determine whether or not the defendant acted in concert as to each count of the indictment;' " the jury charge as a whole indicated that petitioner had to have the requisite intent"). Since the Appellate Division's holding was neither con-

trary to, nor an unreasonable application of, clearly established federal precedent, habeas relief is not warranted.

### C. The Felony Murder Instruction

Williams argues that the trial erroneously failed to include in the felony murder charge the following language requested by defense counsel: "[I]f the jury finds that the killing is an intentional act by a person other than [defendant] for purposes unrelated to the robbery, then it would not be a felony murder." T.672. The defense theory argued on summation was that after the robbery was over, Chislum chased down Dukes and killed him for reasons having nothing to do with the robbery. T.681–82. In his statement to the police Williams admitted that, at his uncle's (*i.e.*, Chislum's) request, he got the "thing," meaning a shotgun that had been stashed in a garbage can behind the house. Williams claimed, however, that he did not become aware that Dukes had been killed until several days after the robbery. Williams indicated in his statement to the police that he did not know that anybody was going to get killed.

■ On direct appeal, the Fourth Department held that the trial court was correct in denying defense counsel's request to charge and "properly charged that, in the context of this case, a person is guilty of felony murder when he commits the crime of first degree robbery and, 'in the course of and in furtherance of such crime or of immediate flight therefrom, another participant causes the death of a person other than one of the participants.'" *People v. Williams*, 239 A.D.2d at 922, 659 N.Y.S.2d 597 (citing N.Y. Penal Law § 125.25(3)). Noting that the proof at trial established that the killing of Dukes occurred "in the course of and in furtherance of the robbery," the court found that the requested statement "neither countered that proof nor established the affirmative defense to felony murder." *Id.* (citing N.Y. Penal Law § 125.25(3)(c)). As the state court observed, felony murder is a strict liability offense, making the killer's subjective intent or motive irrelevant. *See id.* ("Because defendant's request to charge distorted the 'course and furtherance' element and was not supported by a reasonable view of the evidence, the court properly denied it.").[2]

■ In order to prevail on his contention that the trial court erred in refusing to give requested jury instructions, Williams must establish that his own proposed language "'accurately represented the law in every respect,'" and that the charge actually given, viewed as a whole, prejudiced him. *United States v. Dove*, 916 F.2d 41, 45 (2d Cir.1990) (quoting *United States v. Ouimette*, 798 F.2d 47, 49 (2d Cir.1986), *cert. denied*, 488 U.S. 863, 109 S.Ct. 163, 102 L.Ed.2d 134 (1988)); *see*

---

2. The statutory defense to felony murder is set forth in Penal Law § 125.25(3): When the defendant is not the only participant in the crime, "it is an affirmative defense that the defendant: (a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (b) Was not armed with a deadly weapon ...; and (c) Had no reasonable ground to believe that any other participant was armed with such a weapon ...; and (d) Had no reasonable ground to believe that any other participant intended to engage in con-duct likely to result in death or serious physical injury." N.Y. Penal Law § 125.25(3). "Section 125.25(3) affords 'an accomplice of a felon who kills an opportunity to "fight his way" out of a felony murder charge,' but New York courts have read this as affording a 'narrow' exception." *Davis v. Superintendent, Napanoch Corr. Facility*, 1990 WL 160883, at *2 (S.D.N.Y. Oct.13, 1990) (quoting *People v. Bornholdt*, 33 N.Y.2d 75, 350 N.Y.S.2d 369, 375–77, 305 N.E.2d 461 (N.Y.1973), *cert. denied*, 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974) (citation omitted)).

*also United States v. Sabbeth,* 125 F.Supp.2d 33, 38 (E.D.N.Y.2000) ("A party does not have a right to have a requested instruction included within the Court's charge, even if it dovetails with that party's theory of the case, unless it correctly states the law."); *United States v. Kelly,* 349 F.2d 720, 759 (2d Cir.1965) ("[I]t is not the function of the trial judge to put lengthy, confusing or inaccurate requests for instructions through a winnowing or sifting process in an endeavor to select what is good and reject what is bad. If a proffered request is in any respect incorrect, the denial of such a request is not error.").

In the instant case, defense counsel's requested language did not accurately the reflect the law. I note that Williams mischaracterizes the New York state cases which he cites as authority for the proposition that when one of the participants in a felony other than the defendant kills someone for his own personal reasons unrelated to the felony, the defendant is not liable for murder. In *People v. Elling,* 289 N.Y. 419, 46 N.E.2d 501 (N.Y.1943), for example, the state court of appeals reversed the conviction as to defendant Bender where "[t]he unquestioned evidence [was] that the defendant Elling shot Skaritza for a reason personal to Elling and unrelated to the robbery *and that the defendant Bender tried to prevent the act." Id.* (emphasis supplied). In *People v. Truesdell,* 122 A.D.2d 444, 446, 504 N.Y.S.2d 835 (3d Dept.1986), which cited *Elling,* the appellate division upheld the conviction of felony murder where "the *proof established* that [the co-defendant] killed the Lynches, not for any private personal reason . . . , but *in*

*furtherance of the robbery." Id.* (emphasis supplied). Unlike the defendants in *Elling* and *Truesdell,* here the defense essentially offered nothing other than mere surmise that Chislum killed Dukes for some personal reason unrelated to the robbery. Defense counsel suggested in his summation several reasons as to why Chislum might have killed Dukes, but he conceded that "[t]here is really not much evidence on why [Chislum] did it." Despite the lack of proof, the defense nevertheless asserted that "it had nothing to do with the robbery." T.681–82.

■ A careful review of *Elling* shows that it cannot be read as standing for the proposition that the fact that the killing may have **been** done for a reason personal to the defendant's co-felon, without more, entitles the defendant to escape liability for felony murder. The requested language ignores the possibility that a killing may be done for a reason unrelated to the underlying felony, yet still be committed "in the course of and in furtherance of" the felony. Thus, the instruction requested by Williams would have allowed the jury to circumvent the statutory intention of Penal Law § 125.25(3), which is to make all defendants who participate in a commonly planned felony liable for murders committed in the course and furtherance thereof, without regard to the intent of the actual killer. Because the requested charge did not accurately reflect the law "in every respect," *see United States v. Dove,* 916 F.2d at 45 (citations omitted), the trial court's refusal to charge did not run afoul of any federal due process principles.[3]

---

**3.** I note that *People v. Blake,* 44 A.D.2d 606, 353 N.Y.S.2d 528 (2d Dept.1974), the case upon which Williams's defense counsel primarily relied as authority for his proposed language, never was tested on appeal. Also, since it is an intermediate appellate court case, it is not binding New York precedent. Furthermore, it is factually inapposite. In *Blake,* the court noted that defendant initially requested and was granted a charge that "the jury should acquit of felony murder if it found that the actual killing was not done in further-

Williams is not entitled to habeas relief on this claim.

## II. Harsh and excessive sentence

As bases for leniency in his punishment, defense counsel urged the trial court to consider the fact that Chislum was the shooter; that Williams only was seventeen years-old; and that Williams's mother had a severe cocaine problem. Williams contends that in light of these factors the court should have imposed a sentence of less than the maximum twenty-five years to life. The Appellate Division refused to modify Williams's sentence, finding that it was "neither unduly harsh nor severe." *People v. Williams*, 239 A.D.2d at 922, 659 N.Y.S.2d 597.

■ A petitioner's assertion that a sentencing judge abused his discretion in sentencing is generally not a federal claim subject to review by a habeas court. *See Fielding v. LeFevre*, 548 F.2d 1102, 1109 (2d Cir.1977) (petitioner raised no cognizable federal claim by seeking to prove that state judge abused his sentencing discretion by disregarding psychiatric reports) (citing *Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948)) ("The [petitioner's] sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus."). A challenge to the term of a sentence does not present a cognizable constitutional issue if the sentence falls within the statutory range. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir.1992).

■ Second degree murder under Penal Law § 125.25 is a class A–I felony. In this case, New York Penal Law § 70.00 establishes sentencing guidelines for those, like Williams, found guilty of class A–I felonies. Williams's sentence of 25 years

ance of the alleged commonly planned robbery but rather in furtherance of [the cofelon's] own private purpose." *People v. Blake*, 44 A.D.2d at 606, 353 N.Y.S.2d 528. A four-fifths majority of the appellate division held that the trial court's refusal to reiterate this portion of its initial charge when the jury subsequently requested further instructions on the law constituted prejudicial error because, "[o]n the evidence presented, the jury was entitled to acquit defendant of felony murder if it believed the exculpatory portions of his statements." The defendant in *Blake* stated that although he and his co-felon jointly decided to steal the victim's purse, the co-felon grabbed the victim around the neck, dragged her down some steps into an alleyway while defendant remained on the street as a lookout; and that, when his cohort did not quickly return, defendant went down to investigate and was shocked to find that the victim had apparently been the subject of an attempted sexual attack and had been brutally beaten about the head with a rock. *See id.*

Assuming for the sake of argument that *Blake* was correctly decided, Williams's self-serving statements that he "didn't know anybody was going to get killed" and that "if [he] knew that [he] wouldn't have gone along," *see* T.458, do not exculpate him from guilt for felony murder because intent is not a prerequisite of that offense. From Williams's own statement, the most reasonable view of the evidence is that the shooting was done in the course of and in furtherance of the robbery and that Williams watched Chislum shoot Dukes and did nothing to prevent it. Williams told the police that after they pushed Dukes off the porch, "Deke [*i.e.*, Chislum] kept the gun on the dude .... I grabbed some money out of his left back pocket.... I gave Ant [not named in the indictment] one ten and [C]hunky [*i.e.*, McCullough] one ten, and I kept the rest. When I stepped back, Gilla [*i.e.*, Latson] and Ant was [*sic*] going through the dude's pants and one of them had pulled his pants down. All the while Deke kept the gun on the dude. Right around that time, Deke fired the gun and I started to run." T.457. Thus, contrary to defense counsel's assertion at trial, the robbery still was occurring at the time that Dukes was shot. Unlike the situation in *Blake*, there was no evidence at Williams's trial to counter the "course and furtherance" requirement, the key aspect of felony murder.

241

to life clearly was within the statutory limit. *See* New York Penal Law § 70.02(3)(a)(i) ("For a class A–I felony, such minimum period shall not be less than fifteen years nor more than twenty-five years[.]"). Accordingly, William's sentencing claim is not cognizable on habeas review.

## CONCLUSION

For the reasons stated above, Larry Williams's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Williams has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED.**